```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

UNITED STATES OF AMERICA

v.                              CRIMINAL CASE NO. 2:23-00142

KEITH DESHON ADAMS

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Keith Deshon Adams's motion to suppress evidence recovered after a traffic stop. (ECF No. 29). The court took the matter under advisement after a hearing on April 11, 2024. By Order entered May 6, 2024, the court denied the motion. (See ECF No. 57). The reasons for that decision are as follow.

## I. Background

On September 27, 2022, Detective Brandon Dodrill of the Oak Hill, West Virginia, Police Department was patrolling a high-crime area known for drug use and distribution near Crawford Street in Oak Hill. (See Hr'g Tr. at 5:20-11:2, ECF No. 45). The street is "almost like a homeless encampment. There's a bunch of outbuildings, campers. There [were] some tents that people were living in, mostly drug users . . . . There's been drug overdose deaths all in that area." (See id. at 8:18-22).

During this patrol, he observed a blue sedan with Arizona license plates and darkly tinted windows parked in John Hancock's driveway at the end of the dead-end street. (See id.

at 11:7-9).  There was also a group of known drug users gathered outside of Mr. Hancock's home waiting to go inside.  (See id. at 11:14-24).

These circumstances made Detective Dodrill believe a drug resupply was occurring inside the residence.  (See id. at 12:1-16).  He primarily conducts drug investigations as a member of the Central Regional West Virginia Drug and Violent Crime Task Force.  (See id. at 6:5-7).  Based on his experience, he knows that "most drugs in West Virginia come from out-of-state[]" and that "[w]hen the suppliers from out-of-state come in, they have certain people that they deal with, street-level dealers that they'll deal with."  (Id. at 12:2-8).  He also knows that "[t]ypically they don't deal directly with the users" so that they limit their exposure to law enforcement.  (Id. at 12:6-9, 14:1-2).  Therefore, he believed "with an out-of-state vehicle being there, as well as the people congregating outside, . . . that, hey, this is probably the drop that they're waiting on."  (Id. at 12:13-16).

Detective Dodrill was also familiar with Mr. Hancock's residence and knew that he generally kept only his screen door closed during the day.  (See id. at 12:20-23).  However, on this occasion, Mr. Hancock had his solid front door closed as well.  (See id. at 13:7).  This further indicated to Detective Dodrill that "the occupants in the vehicle were more than likely inside

2

of his residence and there was drug activity taking place." (Id. at 13:10-12).

After making these observations, Detective Dodrill drove back to the road that intersected with Crawford Street, parked in a nearby parking lot, and waited for the blue sedan to use the only exit from the street. (See id. at 14:8-13). When the car appeared, "it stopped way longer at the stop sign than most people would stop at a stop sign." (Id. at 15:9-10). When the car eventually turned onto the main road, Detective Dodrill pulled behind it and initiated a traffic stop as it exited onto the highway. (See id. at 17:12-17).

Detective Dodrill's body camera captured the events that followed. When the car pulled over, Detective Dodrill radioed for backup before approaching the vehicle on foot. (See Dodrill Body Cam. 1 at 00:57, Gov't's Ex. 1). He testified that he wanted backup because of the suspected drug activity he observed on Crawford Street. (See Hr'g Tr. at 19:1-6). As backup responded, Detective Dodrill approached the driver's-side window and told the driver he was stopping him for a window-tint violation. (See Dodrill Body Cam. 1 at 1:00-1:13). Detective Dodrill testified that he immediately smelled marijuana. (See Hr'g Tr. at 20:1-2).

The driver informed Detective Dodrill that he did not own the vehicle and purported to call the vehicle's owner to ask

3

where the registration and insurance documents were located. (See Dodrill Body Cam. 1 at 1:25-2:25). The driver provided a non-driver's license "Identification Card" from Illinois. (See id. at 3:22). His passenger, defendant Keith Deshon Adams, provided a Delaware driver's license for "Samir Hakeem Muhammad." See id. During this interaction, defendant reached for the door handle several times as if he were about to flee. (See id. at 1:50, 2:20). Detective Dodrill then asked the driver and defendant to exit the vehicle and stand in front of his police car. (See id. at 3:28). When defendant exited the vehicle, he briefly paused before fleeing on foot. (See id. at 3:50).

Detective Dodrill followed in close pursuit and tased defendant a short distance from the car. (See id. at 3:55). Defendant dropped to the ground and, despite being tased, continued to struggle with Detective Dodrill and reach for a "cross-body" bag secured to defendant's chest. (See id. at 4:10-4:30).

While Detective Doddrill chased and struggled with defendant, Detective Dodrill's backup, Officer Tyler Hogan of the Oak Hill Police Department, arrived on scene. (See Hogan Body Cam. 1 at 00:03, Gov't's Ex. 1). She initially tried to stop the driver from fleeing in the vehicle. (See id.). However, as defendant continued to fight with Detective Dodrill

4

and reach for the bag, Detective Dodrill yelled, "I need some help"! (See id. at 00:31). This prompted Officer Hogan to come to his aid, and she attempted to help subdue defendant as the driver fled the scene in the vehicle. (See id. at 00:36-2:32). However, defendant continued to resist and reach for the cross-body bag, and at some point during the struggle, he removed a large "Ziploc" bag of fentanyl from it. (See id. at 5:00-5:30).

As defendant held the Ziploc bag, it tore open, causing Detective Dodrill to ingest fentanyl and suffer an overdose. (See id. at 6:00-7:45). Additional help arrived on scene and administered Naloxone to him before transporting him to the emergency room. (See id. at 7:52-9:30). At the hospital, he was diagnosed with "poisoning by other drugs." (See Resp. at 5). A short time later, Officer Hogan also began suffering an apparent overdose and was administered Naloxone and transported to the hospital. (See id.).

After defendant was secured and arrested, officers recovered methamphetamine and fentanyl from his person and the area surrounding the struggle. He was charged in a single-count indictment with possession with the intent to distribute five grams or more of methamphetamine and a quantity of fentanyl, in violation of 21 U.S.C. § 841(a)(1). (See ECF No. 2). Defendant asks the court to suppress the drugs recovered, arguing that

5

Detective Dodrill lacked reasonable suspicion for the traffic stop. (See ECF No. 29 at 2).

## II. Legal Standard

The Fourth Amendment prohibits unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. When evidence is recovered in violation of the Fourth Amendment, the court may exclude the evidence as a sanction to deter future violations. See Davis v. United States, 564 U.S. 229, 248 (2011). When seeking to suppress evidence under the exclusionary rule, the defendant initially bears the burden of proof. See United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). If, however, the defendant establishes a proper basis for the motion, the burden shifts to the government to prove the admissibility of the evidence by a preponderance of the evidence. See United States v. Jones, No. 2:22-cr-00137, 2023 WL 2581999, at *3 (S.D.W. Va. Mar. 20, 2023) (citing United States v. Matlock, 415 U.S. 164, 177 n.14 (1974)). The preponderance of the evidence standard requires only that the relevant facts be more likely true than not. See

United States v. Gibson, 309 F. App'x 754, 755 (4th Cir. 2009) (per curium) (citing United States v. Kiulin, 360 F.3d 456, 461 (4th Cir. 2004)).

### III. Analysis

The Supreme Court does not subject investigatory stops to the Warrant Clause of the Fourth Amendment and therefore does not require probable cause to initiate them. See Terry v. Ohio, 392 U.S. 1, 20 (1968). Instead, "to justify such an investigative stop, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant . . . intrusion.'" United States v. Coleman, 18 F.4th 131, 135-36 (4th Cir. 2021) (quoting Terry, 392 U.S. at 21). This is a relatively low threshold:  "The reasonable suspicion inquiry falls considerably short of 51% accuracy." Id. at 136 (quoting Kansas v. Glover, 140 S. Ct. 1183, 1188 (2020)). The Supreme Court has also explained that "[t]o be reasonable is not to be perfect[.]" Glover, 140 S. Ct. at 1188 (quoting Heien v. North Carolina, 574 U.S. 54, 60 (2014)).

In his motion to suppress, defendant initially argued that Detective Dodrill lacked reasonable suspicion to stop him for a window-tint violation because West Virginia's window-tint statute, West Virginia Code § 17C-15-36a (2012), does not apply to out-of-state vehicles. (See ECF No. 29). However, the

7

government explained in its response that despite Detective Dodrill believing the driver's car violated West Virginia's window-tint statute, he had reasonable suspicion of drug trafficking because of his observations from Crawford Street. (See ECF No. 32 at 8-10). The government, therefore, argues that Detective Dodrill lawfully conducted an investigatory stop of the vehicle based on the suspected drug activity. (See id. at 6-10). In the alternative, the government asks the court to apply an exception to the exclusionary rule based on defendant's "intervening illegal acts" following the traffic stop and preceding the discovery of the drugs. (See id. at 11-14).

Following the government's explanation for the stop and a hearing on the motion to suppress, defendant filed a supplemental memorandum arguing that Detective Dodrill lacked reasonable suspicion of drug trafficking. (See ECF No. 47 at 3). He challenges the credibility of Detective Dodrill's testimony for two reasons, and also challenges the objective reasonableness of his alleged suspicion of drug activity. (See id. at 1-5).

In defendant's first challenge to Detective Dodrill's credibility, he argues that Detective Dodrill's testimony that Crawford Street is a "high-crime" area is not credible because he did not produce supporting documentation. (See id. at 3). However, the court finds the testimony credible without the need

8

for supporting documentation because Detective Dodrill is an experienced police officer in Oak Hill; is familiar with the Oak Hill community; routinely patrols the area around Crawford Street; and thoroughly described during his testimony the area, its reputation, and his experiences with it.  "Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.'" United States v. Foreman, 369 F.3d 776, 782 (4th Cir. 2004) (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993)).

In defendant's second challenge to Detective Dodrill's credibility, he argues that because Detective Dodrill said in his police report and during his grand jury testimony that he stopped the vehicle for a window-tint violation, the court should discredit his testimony that he reasonably suspected that the vehicle's occupants were involved in drug trafficking.  (See ECF No. 47 at 1, 7).  However, the court finds this testimony credible as well.  Although Detective Dodrill told the occupants of the vehicle that he stopped them for a suspected window-tint violation and later justified the stop based on that suspected violation, he only did so because he mistakenly believed out-of-state cars were subject to the statute.  It is clear from his testimony and the video evidence that notwithstanding his belief

9

of a window-tint violation, he stopped the vehicle for suspected drug activity.

Notably, when he initiated the stop, he radioed for backup before approaching the vehicle. This, in addition to his detailed testimony at the suppression hearing regarding his observations on Crawford Street, lead the court to find credible his testimony that he suspected that the occupants were engaged in drug trafficking, and that this was more than a routine traffic stop. The question is whether his suspicion was objectively reasonable.

Defendant argues that Detective Dodrill's suspicion was not objectively reasonable because he "did not witness any illegal activity on Crawford Street, and reasonable suspicion must be based on more than 'inarticulable hunches.'" (Id. at 5). He also argues that defendant's "presence in an area of expected criminal activity, standing alone, is not enough" and the driver's cautious driving "adds nothing to the analysis." (Id. at 4, 6).

Contrary to defendant's position, an officer need not witness illegal activity to have reasonable suspicion to support an investigatory stop; courts "cannot afford to read the Fourth Amendment to require officers to wait until criminal activity occurs . . . before taking reasonable, preventive measures." United States v. Perkins, 363 F.3d 317, 328 (4th Cir. 2004).

10

Rather, a police officer must only "observe[] unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry, 392 U.S. at 30 (emphasis added).

When assessing the reasonableness of an officer's suspicion, courts view the facts "from the standpoint of an objectively reasonable police officer." Ornelas v. United States, 517 U.S. 690, 696 (1996). The standpoint "is based largely on the common sense and experience of the investigating officer." United States v. Lester, 148 F. Supp. 2d 597, 600 (D. Md. 2001) (citing Illinois v. Wardlow, 528 U.S. 119 (2000)).

Multiple factors may together "create a reasonable suspicion even where each factor, taken alone, would be insufficient." United States v. George, 732 F.3d 296, 300 (4th Cir. 2013). This is true because "Terry itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008) (quoting United States v. Sokolow, 490 U.S. 1, 9-10 (1989)).

Factors to consider include things like "the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." George, 732 F.3d at 299 (citing Wardlow, 528 U.S. at 124). "And, critically, the facts provided

11

must 'serve to eliminate a substantial portion of innocent travelers.'" United States v. Podielski, No. 22-4084, 2023 WL 4888866, at *8 (4th Cir. Aug. 1, 2023) (quoting McCoy, 513 F.3d at 413).

In this case, the circumstances described by Detective Dodrill eliminate a substantial portion of innocent travelers. Because the blue sedan had Arizona license plates, it was reasonable for Detective Dodrill to believe the occupants traveled from Arizona. It would be unusual for an innocent traveler to travel from there to West Virginia, park at a residence surrounded by homeless people in an area known for drug use and distribution, and occupy the home while known drug users gather outside waiting to enter. While there could be innocent hypothetical explanations for this situation, those would be the exception, and a reasonable officer could eliminate most innocent travelers from the circumstances. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." United States v. Black, 525 F.3d 359, 365 (4th Cir. 2008) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)).

This is similar to United States v. Smart, 91 F.4th 214, 225 (4th Cir. 2024), in which the United States Court of Appeals for the Fourth Circuit found that despite there being "benign explanations" for a driver keeping a gas can in the passenger

12

seat of his vehicle, the district court acted within its discretion when it found the officer's testimony credible and deferred to his "insight that traveling long distances with a gas can inside your car can be behavior that objectively indicates drug trafficking." (citing United States v. Johnson, 599 F.3d 339, 344 (4th Cir. 2010)).

That is the case here: Detective Dodrill credibly testified that based on his experience investigating drug trafficking crimes, traffickers usually prefer not to deal with end users and that when he saw the drug users appearing to wait for "the drop" outside of Mr. Hancock's home, which is usually left open, he suspected the occupants of the vehicle were drug traffickers resupplying a street-level dealer.

These observations, in addition to the driver's excessively long stop at the stop sign when he presumably saw Detective Dodrill's police car waiting at the intersection, reasonably made Detective Dodrill believe that criminal activity was afoot, and these facts satisfy the reasonable suspicion requirement's "low bar." Smart, 91 F.4th at 223. Because the investigatory stop was justified, the court need not address the government's alternative argument.

## IV. Conclusion

13

For the above reasons, the defendant's motion to suppress (ECF No. 29) was **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, the United States Marshal for the Southern District of West Virginia, and the Probation Office of this court.

**IT IS SO ORDERED** this 28th day of May, 2024.

ENTER:

David A. Faber
Senior United States District Judge